**EXHIBIT 11**

LEXSEE



Cited
As of: Oct 11, 2007

## CHRISTOPHER HOPKINS, Plaintiff, vs. TEXAS MAST CLIMBERS, L.L.C., et al., Defendants.

### CIVIL ACTION No. H-04-1884

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

### 2005 U.S. Dist. LEXIS 38721; 152 Lab. Cas. (CCH) P35,110

**December 14, 2005, Decided**
**December 14, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a former employee, sued defendants, his employer and others, for violation of the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., by not paying him overtime. Defendants contended that plaintiff was exempt from overtime requirements pursuant to 29 U.S.C.S. § 213(b)(1), or in the alternative, that overtime was to be calculated on the fluctuating workweek method in 29 C.F.R. § 778.114. The case was tried to the court.

**OVERVIEW:** Only one defendant was an employer for FSLA purposes; neither of the other defendants exercised control over plaintiff's employment. Defendant did not establish that plaintiff was exempt under the motor carrier exemption. His loading activities were a de minimis part of his job and there was no evidence that any truck loaded by plaintiff traveled interstate. Defendant did not keep accurate records, in violation of 29 U.S.C.S. § 211(c), and introduced no evidence to contradict plaintiff's estimate that he worked 65 hours per week. Plaintiff met his burden of showing that the fluctuating workweek method was not applicable. There was no clear mutual understanding that the salary paid to him was intended to compensate him for all the hours he worked

in a workweek. His uncontradicted testimony was that he was to be paid a salary based on a 40 hour workweek. The court assumed 25 hours of overtime for each of 37 weeks, calculated the regular rate of pay and the overtime rate, and entered an award for actual damages. Defendant did not show it acted in good faith when it failed to pay overtime, entitling plaintiff to liquidated damages. Attorney's fees were awarded using a lodestar method.

**OUTCOME:** The court entered judgment for plaintiff for unpaid overtime of $ 15,374.75, for an amount equal to the actual damages for liquidated damages, and for reasonable attorney's fees and costs.

**CORE TERMS:** mast, overtime, salary, truck, workweek, job sites, hourly rate, loading, number of hours, exemption, hours per week, semi-monthly, fluctuating, regular, exempt, pickup truck, conclusions of law, liquidated damages, freight, loaded, multiplied, driver's, burden to prove, motor vehicles, interstate, compensate, payroll, loader', unpaid, times

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Wage & Hour Laws >*





2005 U.S. Dist. LEXIS 38721, *; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

*Coverage & Definitions > Overtime & Work Period*
[HN1]The Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., provides that employers must pay covered employees extra compensation of at least one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week. 29 U.S.C.S. § 207(a)(1). The reach of the FLSA is broad, but not unlimited.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employers*
[HN2]See 29 U.S.C.S. § 203(d).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employers*
[HN3]An employee may have one or more employers for purposes of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq. In determining whether a person or corporation is an "employer" for purposes of the Act, a court should consider the total employment situation, with particular regard to (1) whether the employment takes place on the premises of the company; (2) how much control the person or company exerts over the employee; (3) whether the person or company has the power to fire, hire, or modify the employment terms and conditions; (4) whether the employee performs a "specialty job" within a production line; and (5) whether the employee may refuse to work for the person or company and work for others.

*Labor & Employment Law > Wage & Hour Laws > Administrative Proceedings & Remedies > Burdens of Proof*
*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > General Overview*
[HN4]Certain employees are exempt from coverage under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq. An employer bears the burden to prove that an employee is exempt, and exemptions are to be narrowly construed against the employer.

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
[HN5]The Secretary of Labor's authority to prescribe qualifications and maximum hours extends only to employees that transport passengers or property in interstate commerce whose activities affect the safety of

operation of vehicles on the highways of the country. 49 U.S.C.S. § 13501.

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
[HN6]The Department of Transportation has found that the activities of "loaders" directly affect the safety of operation of motor vehicles in interstate commerce. "Loaders" are employees whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between vehicles and the warehouse.

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
[HN7]The U.S. Supreme Court has held that loaders may be exempt from the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., if their activities consist of work defined by Interstate Commerce Commission ruling as that of a "loader," and as affecting the safety of operation of motor vehicles in interstate or foreign commerce.

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
[HN8]The U.S. Court of Appeals for the Fifth Circuit has characterized Pyramid Motor Freight Corp. v. Ispass as establishing a de minimis rule. An employee is not exempt from the overtime provisions of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., if his work affecting highway safety is only trivial, casual, occasional and insubstantial.

*Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Transportation Industries*
[HN9]See 29 C.F.R. § 782.5(c).

*Labor & Employment Law > Wage & Hour Laws > Administrative Proceedings & Remedies > Burdens of Proof*
*Labor & Employment Law > Wage & Hour Laws > Recordkeeping Requirements*
[HN10]When an employer has failed to maintain accurate payroll records, the employee's initial burden is to make out a prima facie case that the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., has been violated and to produce some evidence to show the amount and extent of the violation. This is not a heavy burden. The employee meets his burden if he produces sufficient evidence,



2005 U.S. Dist. LEXIS 38721, *; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

which may consist of his own credible testimony, to show the amount of work by reasonable inference. The evidence may be inexact or approximate. The burden then shifts to the employer to present evidence of the actual hours the employee worked to contradict the employee's evidence.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Regular Rate*
[HN11]The Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., requires that overtime must be compensated at a rate not less than one and one-half times the "regular rate" at which the employee is actually employed. 29 U.S.C.S. § 207(a); 29 C.F.R. § 778.107. The "regular rate" is the employee's hourly rate as determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid. 29 C.F.R. § 778.109.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Regular Rate*
[HN12]In order to compute overtime pay in a case where the employee is paid on a salary basis rather than an hourly basis, it is necessary to convert the salary to an hourly rate. If the salary is paid weekly, the employee's regular rate of pay is computed by dividing the salary by the number of hours the salary is intended to compensate. 29 C.F.R. § 778.113(a). If the salary is paid semi-monthly, the salary must first be translated into its weekly equivalent by multiplying by 24 and dividing by 52. 29 C.F.R. § 778.113(b). Once the weekly wage is determined, the regular hourly rate is calculated as indicated in § 778.113(a).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Regular Rate*
[HN13]The key factor in figuring the hourly rate for salaried employees is determining the number of hours the salary is intended to compensate. 29 C.F.R. § 778.113(a).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Regular Rate*
[HN14]This "fluctuating workweek" method of calculating unpaid overtime, described at 29 C.F.R. §

114(a), is generally advantageous to the employer for two reasons: (a) the regular hourly rate is reduced, because the number of covered hours is greater than 40; and (b) the unpaid overtime premium is only 50% of the regular hourly rate, because all hours (including overtime hours) have already been compensated at the straight time rate.

*Labor & Employment Law > Wage & Hour Laws > Administrative Proceedings & Remedies > Burdens of Proof*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Regular Rate*
[HN15]Because the fluctuating workweek is neither a defense nor an exemption to the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., an employee has the burden of proving that the method does not apply to his case. This is but another way of saying that the employee has the burden to prove his damages by establishing the number of hours his salary was intended to cover. Unless the employee establishes that his salary was supposed to cover some fixed, lesser number of hours, the salary will be presumed to cover all hours actually worked. Of course, the resulting rate must not be less than the statutory minimum wage. 29 C.F.R. §§ 778.113(b), 778.114(a).

*Labor & Employment Law > Wage & Hour Laws > Remedies > Liquidated Damages*
[HN16]A successful plaintiff under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., is entitled to liquidated damages equal to the amount of actual damages. 29 U.S.C.S. § 260. The court has discretion to reduce the amount of liquidated damages only if the employer meets its burden to prove it acted in good faith in deciding how to pay plaintiff. An employer's burden is a substantial one.

*Labor & Employment Law > Wage & Hour Laws > Remedies > Costs & Attorney Fees*
[HN17]A prevailing party entitled to an award of attorney's fees and costs pursuant to 29 U.S.C.S. § 216(b). An award of reasonable attorney's fees is mandatory under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq.

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Reasonable Fees*





2005 U.S. Dist. LEXIS 38721, *; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

*Labor & Employment Law > Wage & Hour Laws > Remedies > Costs & Attorney Fees*
[HN18]The lodestar method in calculating attorney's fees is calculated by multiplying the reasonable number of hours expended by an appropriate hourly rate. The court then considers whether an increase or decrease from the lodestar is warranted based on the factors listed in Johnson v. Georgia Highway Express, Inc. Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee; (6) the fee being fixed per hour; (7) the time limitations imposed by the client and the circumstances; (8) the amount involved and the likely results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the attorney's fees awarded in similar cases. The fee award is not limited by a contingent fee agreement.

**COUNSEL:** [*1] For Christopher Hopkins, Plaintiff: Daniel W Jackson, Emmons & Jackson PC, Houston, TX.

For Texas Mast Climbers LLC, Mast Climbers Manufacturing Inc, doing business as American Mast Climbers, American Mast Climbers LLC, William F Mims, Jr, AMS Staff Leasing NA Ltd, Defendants: William H Bruckner, Attorney at Law, Houston TX, Michael Kevin Burke, Bruckner Burch PLLC, Houston, TX.

**JUDGES:** Stephen Wm Smith, United States Magistrate Judge.

**OPINION BY:** Stephen Wm Smith

**OPINION**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case brought under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq., (FLSA) was tried to the court on October 27, 2005. The parties consented to the jurisdiction of this magistrate judge for all purposes, including final judgment.

Hopkins contends that defendants violated the FLSA by not paying him overtime. Defendants contend that Hopkins is exempt from the overtime requirements of the FLSA pursuant to 29 U.S.C. § 213(b)(1). In the alternative, defendants argue that overtime should be calculated based on the fluctuating workweek calculation method set forth in 29 C.F.R. § 778.114. [1] Based [*2] on the evidence presented at trial and applicable law, the court makes the following findings of fact and conclusions of law. [2]

> 1    At the conclusion of evidence, the court granted the parties leave to file post-trial briefs. The parties were instructed to file simultaneous post-trial briefs on or before November 11, 2005. Plaintiff was directed to include in his brief evidence and argument in support of an award of attorney's fees. Defendants were given until November 18, 2005 to respond to the request for attorney's fees *only*. This limitation was expressly stated in the minute order from the trial (Dkt. 43). Defendants filed an untimely reply brief on November 19, 2005 attacking plaintiff's damages calculation. Because the reply brief disregards the court's instructions, the court will disregard the reply brief, which offers no new argument or authority in any event.
>
> In addition, defendants' post-trial briefing relies on evidence not admitted at trial, specifically the results of a wage and hour investigation conducted by the Department of Labor. The court does not consider the Department of Labor investigation in reaching its decision.
>
> [*3]
>
> 2    To the extent any item designated as a finding of fact is actually a conclusion of law, it is adopted as such and vice versa.

### I. FINDINGS OF FACT

1. Defendant William F. Mims, Jr. is the sole owner of defendant Mast Climbers Manufacturing, Inc. d/b/a American Mast Climbers (collectively "Mast Climbers"). Mims also owns Texas Mast Climber L.L.C., a holding company that owns equipment used by Mast Climbers.

2. Mast Climbers rents and assembles elevating work platforms, scaffolding, mast climbing platforms, hoists, and various construction equipment.

  

2005 U.S. Dist. LEXIS 38721, *3; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

3. Defendant AMS Staff Leasing handles payroll functions for Mast Climbers. Although AMS is the name that appears on Hopkins's checks, Hopkins has never talked to anyone with AMS and does not know where the company is located. AMS had no control over Hopkins's work.

4. Hopkins worked for Mast Climbers from April 16, 2003 through June 18, 2003 and again from September 23, 2003 through April 3, 2004, a total of 37 weeks. Hopkins's primary job responsibility was to erect and dismantle scaffolding, hoists, and related equipment. [*4] He worked on various construction projects in Texas and Louisiana.

5. Mast Climbers' scaffolding equipment was kept at its "yard" in Fort Worth for delivery by truck to job sites. Sometimes equipment was trucked from one job site to another without returning to Fort Worth.

6. Mims worked, and during the period at issued lived, out of Mast Climbers' office in Fort Worth. Mims was not on the job sites all the time, and in fact at times did not know where Hopkins was working. He saw Hopkins on average once or twice a month.

7. Hopkins, a Houston resident, was rarely in Fort Worth. For that reason, it was not a usual part of his job to load trucks with scaffolding equipment for delivery to a job site. A daily work report indicates that Hopkins assisted with loading 8 1/2' tie-pipes onto a pickup truck at the Fort Worth facility on March 3, 2004. That truck was driven to a job site in Dallas. That is the only evidence in the record of Hopkins performing loading activities at the Fort Worth equipment yard.

8. Hopkins worked as part of a two-man crew with his supervisor, Dennis Dan. Hopkins did not at any relevant time have a driver's license. Therefore, it was the usual practice for [*5] Hopkins to ride to job sites in a pickup truck driven by Dan, who would pick up Hopkins at his residence in Houston. On two or three occasions Hopkins drove the pick-up truck home from a job site because they had worked long hours and Dan could not stay awake.

9. Small tools and equipment necessary for the job were transported in the pickup truck. Dan loaded tools into the truck before picking up Hopkins. Occasionally, equipment such as pipes, a welding machine, or parts and pieces of a tower, would need to be shuttled between job sites using the pickup truck. Although Mims testified that this was a routine practice, there is no evidence that Hopkins himself ever loaded a pickup truck for this purpose.

10. Dan and Hopkins filled out time sheets, daily reports, and service and inspection reports to keep track of the work they performed at job sites. It was Dan's job to make sure these reports were faxed to Mims in Fort Worth.

11. After completion of a job, the equipment would be loaded for return to the yard or transport to another job site. Hopkins worked primarily with a Mast Climbers truck driver named Dustin Bushnell, although he recalls working a few times with a driver named [*6] Pete. On a very large job, many trucks might be required to remove all of the equipment from the job site. In that case, Mims would hire a commercial trucking company.

12. Loading a truck at a job site was a three man operation. Dan was responsible for driving the forklift and putting the equipment on the truck. The truck driver, usually Dustin, would supervise and ensure proper placement of the equipment. Hopkins would assist by moving the equipment for Dan to pick up and by directing traffic. On the few occasions when Hopkins assisted in loading a truck after a job was completed, he placed equipment on the truck at the direction of the truck driver and exercised no discretion. Mims acknowledged that during the time Hopkins worked with Dan, it was Dan's responsibility to know how to load the trucks.

13. Mims was not routinely on the job site with Dan and Hopkins. His knowledge of what went on at the job site is based on his review of the daily reports. Mims does not have any personal knowledge of how or by whom trucks were loaded at job sites in Louisiana.

14. Mims was present for the tear-down of a very large job in the Houston area known as Intrepid Stone. Mast Climbers' equipment [*7] was on that job site for approximately 18 months. During the tear-down, which lasted 4 or 5 days, Mims personally drove the forklift to load the trucks. He recalls Hopkins working alongside him, but Hopkins did not drive the forklift or actually place equipment on a truck during that job.

15. Dan stopped working for Mast Climbers less than 30 days before Hopkins was terminated. After Dan left, Hopkins worked with Adam Martin. Again, because





2005 U.S. Dist. LEXIS 38721, *7; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

Hopkins did not have a driver's license, Martin drove the pickup truck and took over the job of faxing time sheets and daily reports to Fort Worth. Hopkins was the senior member of the crew, but was never actually promoted to supervisor. There is no evidence that Hopkins loaded a truck, either at a job site or in Fort Worth, during the brief period of time after Dan left Mast Climbers and Hopkins was terminated.

16. Mims acknowledged that it was not unusual for Hopkins to work in excess of 50 hours per week. If a job was out of town, the crew would work long hours for as many days as necessary to get the job done and head home. Hopkins generally worked six days per week and took off very few days. Hopkins estimates he worked an average of 65 hours [*8] per week during his 37 weeks of employment. Mast Climbers offered no evidence to the contrary.

17. Records produced by Mast Climbers indicate that Hopkins worked over 40 hours in at least 20 of those weeks. However, there are many days unaccounted for by Mast Climbers' records. Hopkins testified that he worked several days for which there are no time records, including six hours on December 25,2004. Hopkins did not keep copies of his time sheets, and therefore cannot remember exactly which days he worked. Hopkins found three time sheets covering the weeks from March 8 through March 28,2004 in the pickup truck after his termination on April 3, 2004, which he produced to counsel but which were not produced by Mast Climbers. Mims did not handle any payroll functions and does not know why there are gaps in the records.

18. For the nine-week period from April 16, 2003 through June 18, 2003, Mast Climbers paid Hopkins $ 866.67 twice a month. For the 21-week period from September 23, 2003 through February 15, 2004, Mast Climbers paid Hopkins $ 960.00 twice a month. For the seven-week period from February 16, 2004 through April 3, 2004, Mast Climbers paid Hopkins $ 1,083.33 twice a month. [*9] Mast Climbers paid Hopkins the same amount no matter how many hours he worked in a week.

19. Before he was hired on April 16, 2003, Dan told Hopkins that he would be paid between $ 430 and $ 450 per week, based on a 40 hour workweek. There was no discussion of overtime.

20. Hopkins was given an employee handbook when he was initially hired by Mast Climbers. The handbook

indicates that work-time for field personnel was from 6:00 am until 3:30 pm, Monday through Friday, with 30 minutes for lunch. Employees were also expected to be on call on weekends on a rotating basis. Weekend hours for on-call employees were Saturday from 6:00 am until noon, with longer hours in case of an emergency. The handbook does not contradict Hopkins's assertion that his salary was intended to cover a 40 hour workweek.

21. Before starting work the second time, Hopkins talked to Dan about his salary and hours. Dan offered Hopkins more money to return to work. Even though he had worked more than forty hours per week during his first period of employment, Hopkins believed Dan when he said that Hopkins would be paid based on a 40 hour week, [3] and that overtime was not expected. Hopkins accepted the offer to [*10] return to employment with Mast Climbers because he needed the money and enjoyed the work. Mims never spoke with Hopkins about his salary or overtime, and does not know what was said in the conversations between Hopkins and Dan. Dan did not testify at trial.

> 3 Although Mast Climbers disputed at trial that Hopkins was paid based on a 40 hour week, Mast Climbers submitted as part of the Joint Pretrial Order a proposed finding of fact for each period of employment Hopkins was paid a salary on a semi-monthly basis that equated to a specific hourly rate "for a forty-hour work week." Defendants' proposed findings of fact and conclusions of law (Dkt. 39), P 13.

22. Hopkins's last day of work for Mast Climbers was April 3, 2004.

## II. CONCLUSIONS OF LAW

1. [HN1]The FLSA provides that employers must pay covered employees extra compensation of at least one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week. 29 U.S.C. § 207 (a)(1) [*11] . The reach of the FLSA is broad, but not unlimited. *Cleveland v. City of Elmendorf,* 388 F.3d 522, 526 (5th Cir. 2004).

### A. Hopkins's Employer

2. Under FLSA § 203(d):

[HN2]'Employer' includes any person

Page 6

  

2005 U.S. Dist. LEXIS 38721, *11; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

3. [HN3]An employee may have one or more employers for purposes of the FLSA. In determining whether a person or corporation is an "employer" for purposes of the act, the court should consider the total employment situation, with particular regard to (1) whether the employment takes place on the premises of the company; (2) how much control the person or company exerts over the employee; (3) whether the person or company has the power to fire, hire, or modify the employment terms and conditions; (4) whether the employee performs a "specialty job" within a production line; and (5) whether the employee may refuse to work for the person or company and work for others. [*12] *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968).

4. There is no dispute in this case that Mast Climbers (including Mims) was Hopkins's employer. The court concludes that neither Texas Mast Climber L.L.C. nor AMS was Hopkins's employer for purposes of the FLSA. The former is merely a holding company that leases equipment to Mast Climbers, while the latter provides staffing and payroll services; neither exercised control over Hopkins's employment.

## B. Section 213(b)(1) Exemption

5. [HN4]Certain employees are exempt from FLSA coverage. The employer bears the burden to prove that an employee is exempt, and "exemptions are to be narrowly construed against the employer." *Cleveland*, 388 F.3d at 526.

6. At issue in this case is the exemption for any employee whom the Secretary of Transportation (Secretary) has the "power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). In order for this motor carrier exemption to apply, it does not matter if the Secretary has actually established qualifications and maximum hours of [*13] service, but only whether the Secretary has the power to do so. 29

C.F.R. § 782.1; *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47-48, 63 S. Ct. 917, 87 L. Ed. 1244 (1943).

7. [HN5]The Secretary's authority to prescribe qualifications and maximum hours extends only to employees that transport passengers or property in interstate commerce whose activities affect the safety of operation of vehicles on the highways of the country. 49 U.S.C. § 13501; *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 671, 67 S. Ct. 931, 91 L. Ed. 1158 (1947).

8. [HN6]The Department of Transportation has found that the activities of "loaders" directly affect the safety of operation of motor vehicles in interstate commerce. *Levinson*, 330 U.S. at 669. "Loaders" are employees whose "sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between vehicles and the warehouse." *Id. at 652 n.2* (citing an Interstate Commerce Commission ruling).

9. In *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 706, 67 S. Ct. 954, 91 L. Ed. 1184 (1947), [HN7]the Supreme Court held that loaders may be exempt from the FLSA if their activities consist of work [*14] defined by ICC ruling as that of a "loader," and as affecting the safety of operation of motor vehicles in interstate or foreign commerce. Remanding for additional fact-finding, the Court elaborated further:

> The District Court shall not be concluded by the name which may have been given to [an employee's] position or to the work that he does, nor shall the District Court be required to find that any specific part of his time in any given week must have been spent in those activities. The District Court shall give particular attention to whether or not the activities of the respective respondents included that kind of loading' which is held by the Commission to affect safety of operation. In contrast to the loading activities in the Levinson case, the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles





or to such limited handling of them, that his activities will not come within the kind of loading' which is described by the Commission and which, in its opinion, [*15] affects safety of operation.

*Id. at 707-08* (citation omitted).

10. [HN8]The Fifth Circuit has characterized *Pyramid* as establishing a *de minimis* rule. An employee is not exempt from the overtime provisions of the FLSA if his work affecting highway safety is only "trivial, casual, occasional and insubstantial." *Wirtz v. Tyler Pipe and Foundry Co.*, 369 F.2d 927, 930 (5th Cir. 1966); *Mitchell v. Meco Steel Supply Co.*, 183 F. Supp. 777, 779 (S.D. Tex. 1956) (while employee's duties from time to time included assisting with the loading and unloading of trucks, his connection with such activities was so casual and inconsequential as not to bring him within the exception to the FLSA).

11. In addition, federal regulations provide that:[HN9]

An employee who has no responsibility for the proper loading of a motor vehicle is not within the exemption as a loader' merely because he furnishes physical assistance when necessary in loading heavy pieces of freight, or because he deposits pieces of freight in the vehicle for someone else to distribute and secure in place, or even because he does the physical work of arranging pieces of freight in [*16] the vehicle where another employee tells him exactly what to do in each instance and he is given no share in the exercise of discretion as to the manner in which the loading is done.

*29 C.F.R. § 782.5(c).*

12. Applying these standards to the facts of this case, the court concludes that Mast Climbers has not met its burden to prove that Hopkins was exempt from overtime under the FLSA motor carrier exemption. Hopkins's loading activities were a *de minimis* part of his job under the principles established in *Pyramid*. Hopkins's testimony on this score was credible, and uncontradicted by any eyewitness testimony. In addition, there is no

evidence that any truck loaded by Hopkins traveled interstate. Therefore, the motor carrier exemption of 29 U.S.C. § 213(b)(1) does not apply.

13. Hopkins has clearly met his burden to show an overtime violation of the FLSA. There is no dispute that he worked more than 40 hours in a workweek, and that he was not paid the statutory premium for those overtime hours.

## C. Computing Unpaid Overtime

14. Mast Climbers failed to maintain time or payroll records accurately reflecting [*17] the number of hours actually worked by Hopkins, in violation of 29 U.S.C. § 211(c).

15. [HN10]When an employer has failed to maintain accurate payroll records, the employee's initial burden is to make out a prima facie case that the FLSA has been violated and to produce some evidence to show the amount and extent of the violation. *Beliz v. W. H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330 (5th Cir. 1985) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946)). This is not a heavy burden. The employee meets his burden if he produces sufficient evidence, which may consist of his own credible testimony, to show the amount of work by "reasonable inference." The evidence may be inexact or approximate. The burden then shifts to the employer to present evidence of the actual hours the employee worked to contradict the employee's evidence. *Id. at 1330-31.*

16. Hopkins testified based on his recollection that he worked on average 65 hours per week. Mast Climbers introduced no evidence to contradict this estimate. In fact, Mast Climbers' evidence is fairly consistent with Hopkins's estimate. Mast Climbers' time records [*18] are incomplete, but the records that do exist show that he worked over 40 hours in 20 of his 37 weeks of employment. Hopkins worked over ninety hours each of the first two weeks of January, 2004, and over eight-six hours the week of March 8, 2004. Mims testified that it was not unusual for Hopkins to work more than 50 hours per week, and that while he sometimes worked less, he sometimes worked a lot more.

17. The court credits Hopkins's testimony regarding the number of hours he worked. The court will assume 25 hours of overtime for each of the 37 weeks of Hopkins's



2005 U.S. Dist. LEXIS 38721, *18; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

employment in calculating his overtime pay.

18. [HN11]The FLSA requires that overtime must be compensated at a rate not less than one and one-half times the "regular rate" at which the employee is actually employed. 29 U.S.C. § 207(a); 29 C.F.R. § 778.107. The "regular rate" is the employee's hourly rate as determined "by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the **total number of hours actually worked** by him in that workweek **for which such compensation was paid**." 29 C.F.R. § 778.109 [*19] (emphasis supplied).

19. [HN12]Hopkins was paid on a salary basis rather than an hourly basis. In order to compute overtime pay in such a case, it is necessary to convert the salary to an hourly rate. If the salary is paid weekly, the employee's regular rate of pay is computed "by dividing the salary by **the number of hours the salary is intended to compensate**." 29 C.F.R. § 778.113(a)(emphasis supplied). If, as in Hopkins's case, the salary is paid semi-monthly, the salary must first be "translated into its weekly equivalentby multiplying by 24and dividing by52." 29 C.F.R. § 778.113(b). Once the weekly wage is determined, the regular hourly rate is calculated as indicated in § 778.113(a).

20. [HN13]The key factor in figuring the hourly rate for salaried employees is determining "the number of hours the salary is intended to compensate." 29 C.F.R. § 778.113(a). Mast Climbers contends that there was a clear mutual understanding that the salary paid to Hopkins was intended to compensate him for all hours worked each workweek, whatever their number. [HN14]This is known as the "fluctuating workweek" method, described [*20] at 29 C.F.R. § 778.114(a). This method of calculating unpaid overtime is generally advantageous to the employer for two reasons: (a) the regular hourly rate is reduced, because the number of covered hours is greater than 40; and (b) the **unpaid** overtime premium is only 50% of the regular hourly rate, because all hours (including overtime hours) have already been compensated at the straight time rate.

21. [HN15]Because the fluctuating workweek is neither a defense nor an exemption to the FLSA, the employee has the burden of proving that the method does not apply to his case. *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001). This is but another way of saying that the employee has the burden to prove his damages by establishing the number of hours his

salary was intended to cover. Unless the employee establishes that his salary was supposed to cover some fixed, lesser number of hours, the salary will be presumed to cover all hours actually worked. [4]

> 4    Of course, the resulting rate must not be less than the statutory minimum wage. *See* 29 C.F.R. §§ 778.113(b), 778.114(a).

[*21] 22. Hopkins has met his burden of showing the fluctuating workweek method is not applicable here. There was no clear mutual understanding that the salary paid to Hopkins was intended to compensate him for all hours he was called upon to work in a workweek, whether few or many. Hopkins testified without contradiction that his supervisor told him, both when he was hired and when he was rehired, that he would be paid a salary based on a 40 hour workweek. Unlike in *Samson*, there is no evidence in this case that Mast Climbers had consciously adopted the fluctuating workweek method in advance, or that anyone from Mast Climbers ever explained the fluctuating workweek policy to Hopkins. The employee handbook did indicate that more than 40-hours might be required in a week, but it did not address whether the salary was intended to cover all hours worked, or how the employee would be compensated for overtime hours. There simply is no basis to conclude that Hopkins clearly understood that his salary was to compensate him for all hours worked in any given workweek.

23. Because the fluctuating workweek standard does not apply, the court calculates Hopkins's damages on the assumption that [*22] his salary was based on a 40 hour workweek, and that he has not received any straight time compensation for overtime hours. During his first period of employment, Hopkins was paid $ 866.67 semi-monthly for 9 weeks. This results in an hourly rate of $ 10.00. [5] Because Hopkins worked 25 hours of overtime each week, he is entitled to overtime compensation of $ 3,375.00 for this period. [6] Using the same calculation method, Hopkins is entitled to overtime compensation of $ 8,720.25 for the period he was paid $ 960.00 semi-monthly, and $ 3,279.50 for the period he was paid $ 1,083.33 semi-monthly. [7] Therefore, Hopkins will be awarded overtime compensation of $ 15,374.75.

> 5    To arrive at an hourly rate, one multiples $ 866.67 by 24, divides the result by 52 to arrive at a weekly salary of $ 400, and divides by 40 hours to determine the hourly rate of $ 10.00.

  

2005 U.S. Dist. LEXIS 38721, *22; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

6    25 hours per week multiplied by 9 weeks equals 225 total overtime hours, which sum is multiplied by 15, or 1.5 times the $ 10.00 hourly rate, to reach $ 3,375.00.

7    Hopkins's hourly rate when he made $ 960.00 semi-monthly was $ 11.07. 525 overtime hours (25 multiplied by 21 weeks), at $ 16.61 per hour ($ 11.07 multiplied by 1.5), totals $ 8,720.25.

> Hopkins's hourly rate when he made $ 1,083.33 semi-monthly was $ 12.49. 175 overtime hours (25 multiplied by 7 weeks), at $ 18.74 per hour ($ 12.49 multiplied by 1.5), totals $ 3,279.50.

[*23] **D. Liquidated Damages**

24. [HN16]A successful FLSA plaintiff is entitled to liquidated damages equal to the amount of actual damages. 29 U.S.C. § 260. The court has discretion to reduce the amount of liquidated damages only if the employer meets its burden to prove it acted in good faith in deciding how to pay plaintiff. *Id.*; *Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1031 (5th Cir. 1993). The employer's burden is a substantial one. *Singer v. Waco*, 324 F.3d 813, 823 (5thCir. 2003).

25. Mast Climbers has not met its burden to prove that it acted in good faith when it failed to pay Hopkins overtime. Mast Climbers argues that it relied on a subsequent Department of Labor ruling that erectors were exempt employees in deciding not to pay overtime. This argument fails first because the results of that investigation are not in evidence. However, even if such evidence had been admitted, the investigation did not begin until less than one month before Hopkins was terminated, and the results were not known until well after Hopkins was terminated. Thus, Mast Climbers could not have relied on the investigation in determining [*24] how to pay Hopkins. Mast Climbers offered no other explanation for its decision not to pay overtime. Hopkins will be awarded $ 15,374.75 as liquidated damages.

**E. Attorney's Fees and Costs**

26. Hopkins is the [HN17]prevailing party in this case. As such, he is entitled to an award of attorney's fees and costs pursuant to 29 U.S.C. § 216(b). An award of reasonable attorney's fees is mandatory under the FLSA.

*Singer*, 324 F.3d at 829 n.10; *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1191 n. 18 (5th Cir. 1979).

27. The court applies the lodestar method in calculating attorney's fees. *Singer*, 324 F.3d at 829. [HN18]The lodestar is calculated by multiplying the reasonable number of hours expended by an appropriate hourly rate. *Id.* The court then considers whether an increase or decrease from the lodestar is warranted based on the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *Id.* Those factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services [*25] properly; (4) the preclusion of other employment; (5) the customary fee; (6) the fee being fixed per hour; (7) the time limitations imposed by the client and the circumstances; (8) the amount involved and the likely results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) attorney's fees awarded in similar cases. *Johnson*, 488 F.2d at 717-19. The fee award is not limited by a contingent fee agreement. *Blanchard v. Bergeron*, 489 U.S. 87, 92-94, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1989).

28. The billing rate of lead counsel, Daniel W. Jackson, is $ 225.00 per hour. The billing rate for Jackson's associates is $ 125.00. These are reasonable rates for this type of case in Houston, Texas. Mast Climbers concedes this point.

29. Counsel spent a total of 178.70 hours on this case, which was filed on May 7, 2004 and tried on October 27, 2005. This includes successfully defending against defendants' motion for summary judgment. Counsel engaged in significant discovery, including deposing Mims and defending the deposition of Hopkins, propounding and answering [*26] written discovery, and undertaking third party document discovery from two Mast Climbers' clients. A review of the billing summary submitted by counsel indicates that the majority of work was performed by Jackson, with little or no duplication of effort by associates. [8] The court concludes that 178.70 hours is a reasonable number of hours to expend in the successful prosecution of this case.

8    Jackson worked 134.90 hours, associate Amanda Bedford worked 42.80 hours, and associate Joseph Ruiz worked 1 hour.




2005 U.S. Dist. LEXIS 38721, *26; 152 Lab. Cas. (CCH) P35,110
12 Wage & Hour Cas. 2d (BNA) 236

30. Hopkins does not seek an upward adjustment from the lodestar. Mast Climbers agrees that plaintiff's counsels' billing rates are reasonable and makes no specific objection to the number of hours expended in this case. [9] The court concludes that Hopkins is entitled to an award of a reasonable attorney's fees of $ 35,827.50.

> 9 Mast Climbers asserts only that had plaintiff's counsel had a lower opinion of his client's chances of success, they could have possibly settled the matter without a trial.

[*27] 31. The evidence also established that Hopkins incurred costs of $ 3,855.87. These costs are comprised of postage charges, fax charges, copying costs, computerized research fees, messenger services, process server charges, and court reporter fees. Again, Mast Climbers makes no objection to the costs and based on counsel's affidavit the court concludes that they were reasonable and necessary. Hopkins will be awarded costs in the amount of $ 3,855.87.

### III. CONCLUSION

For the reasons stated above, the court concludes that Hopkins is entitled to judgment against Mast Climbers, jointly and severally, for $ 15,374.75 in unpaid overtime, $ 15,374.75 as liquidated damages, and $ 39,683.37 as reasonable attorney's fees and costs.

The court will issue a separate final judgment.

Signed at Houston, Texas on December 14, 2005.

Stephen Wm Smith

United States Magistrate Judge

### FINAL JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law issued this day, it is hereby

**ORDERED** that Hopkins shall recover from Mast Climbers Manufacturing, Inc. d/b/a American Mast Climbers and William F. Mims, jointly and severally, as follows:

(i) $ 15,374.75 [*28] in unpaid overtime;

(ii) $ 15,374.75 as liquidated damages; and

(iii) $ 39,683.37 as reasonable attorney's fees and costs.

This judgment shall accrue interest at the rate of 4.35% per annum.

Signed at Houston, Texas on December 14, 2005.

Stephen Wm Smith

United States Magistrate Judge

  

**EXHIBIT 12**

LEXSEE



Analysis
As of: Oct 11, 2007

VICTORIA ABARCA and MARIA SIERRA, on behalf of themselves and other
similarly situated employees, Plaintiffs, v. MANHEIM SERVICES
CORPORATION, d/b/a GREATER CHICAGO AUTO AUCTION; and COX
ENTERPRISES, INC., Defendants.

Case No. 05 C 3873

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

2006 U.S. Dist. LEXIS 13777

March 24, 2006, Decided

**SUBSEQUENT HISTORY:** Partial summary judgment granted by Abarca v. Manheim Servs. Corp., 2007 U.S. Dist. LEXIS 4656 (N.D. Ill., Jan. 19, 2007)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees filed a class action complaint against defendants, their employer and the employer's corporate parent, alleging that the employer had failed to pay them overtime pay. The parent moved to dismiss the claims against it, asserting that the court lacked personal jurisdiction over it.

**OVERVIEW:** Defendants were not Illinois residents. The employer, one of the parent's wholly-owned subsidiaries, operated a business in Illinois. The parent contended that the court lacked personal jurisdiction over it because, unlike the employer, it was not licensed or authorized to do business in Illinois, it did not carry on any businesses or hold any meetings in Illinois, it did not have a registered agent in Illinois, and it owned no property in Illinois. The employees argued that personal jurisdiction existed, based on the fact that the parent maintained an employment website in Illinois and that it sponsored and administrated an employee health and welfare plan, in which they participated. The court held that the employees failed to establish a prima facie case for personal jurisdiction over the parent under 735 Ill. Comp. Stat. 5/2-209. The sponsorship of the benefit plan was insufficient to establish general jurisdiction over the parent; the sponsorship did not constitute substantial or continuous contact with Illinois. The parent was not the employees' "employer" for Fair Labor Standard Act purposes. The website did not give rise to general or personal jurisdiction over the parent.

**OUTCOME:** The court granted the parent's dismissal motion.

**CORE TERMS:** website, personal jurisdiction, subsidiary, flex, forum state, general jurisdiction, interactive, interactivity, auction, minimum contacts, user, prima facie case, non-resident, purposefully, interaction, day-to-day, continuous, e-mail, customer service, burden of establishing, exercise of jurisdiction, privilege of conducting activities, reasonably anticipate, foreign jurisdiction, shareholder, operational, administers, systematic, residents, availed

**LexisNexis(R) Headnotes**





2006 U.S. Dist. LEXIS 13777, *

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > Initial Burden of Persuasion*

[HN1]A plaintiff has the burden of establishing a prima facie case of personal jurisdiction. When determining whether the plaintiff has met the burden of establishing a prima facie case of jurisdiction, the court must take jurisdictional allegations in the complaint as true, unless controverted by the defendant. When deciding whether the plaintiff has made a necessary showing, a court can look to affidavits and exhibits submitted by each party. Additionally, all factual disputes must be resolved in favor of the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*

[HN2]A determination of whether the United States District Court for the Northern District of Illinois, Eastern Division, has personal jurisdiction over nonresident defendants requires an examination of three sources of law: (1) state statutory law, (2) state constitutional law, and (3) federal constitutional law.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*

[HN3]Under Illinois law, a defendant is subject to the jurisdiction of its courts if it is doing business within the state or if the cause of action arises from several specified acts, including committing a tortious act, within the state. 735 Ill. Comp. Stat. 5/2-209(b)(4), (a)(2). The statute also provides that an Illinois court may exercise jurisdiction on any basis permitted by the state or federal constitution. 735 Ill. Comp. Stat. 5/2-209(c). Therefore, the statute authorizes the exercise of personal jurisdiction by the Illinois courts to the fullest constitutional limit, and the statutory analysis collapses into a due process inquiry and whether the defendant has engaged in any of the acts enumerated in the long-arm statute need not be considered by the court.

*Civil Procedure > Jurisdiction > Personal Jurisdiction*

*& In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment*

[HN4]The Due Process Clause permits an Illinois court to exercise jurisdiction over a nonresident defendant only if the defendant has had certain minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. A defendant need not be physically present within the jurisdiction to have sufficient minimum contacts if the defendant does something by which he purposefully availed himself the privilege of conducting activities in the forum state. The critical inquiry is whether the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court in the forum state. This determination depends on whether the plaintiff asserts general or specific jurisdiction against the defendant.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*

[HN5]General jurisdiction is for suits neither arising out of nor related to a nonresident defendant's contacts, and it is permitted only where the defendant has continuous and systematic general business contacts with the forum state. A defendant with extensive contacts in a state can be subject generally to the personal jurisdiction of that state's courts. In order to have general jurisdiction, the business activities of the defendant cannot be inadvertent, trivial or sporadic; they must be intentional, substantial and continuous. A finding that a nonresident defendant is doing business in Illinois so as to maintain a presence in the forum subjects him to personal jurisdiction of Illinois courts for all matters.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment*
*Evidence > Procedural Considerations > Burdens of*

Page 2

  

2006 U.S. Dist. LEXIS 13777, *

*Proof > Initial Burden of Persuasion*

[HN6]Specific jurisdiction refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. To determine whether specific jurisdiction exists, the United States District Court for the Northern District of Illinois, Eastern Division, must determine whether a nonresident defendant has purposefully established minimum contacts within Illinois and whether those contacts would make personal jurisdiction reasonable and fair under the circumstances. Defendants must have purposefully availed themselves of the privilege of conducting activities within the forum state, invoking the benefits and protections of its laws, such that they would reasonably anticipate being haled into court there. The plaintiffs must establish that haling the nonresident defendant into court is consistent with the Fourteenth Amendment's due process clause. The due process requirement is met if: (1) the defendant has sufficient minimum contacts with the forum state; (2) the claims asserted arise or result from the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > Distinct & Separate Principle*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Substantial Contacts*
*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Plan Establishment*

[HN7]A nonresident corporate parent's activities in Illinois are not "substantial" or "continuous and systematic" by sponsoring a health and welfare plan that includes Illinois residents as participants and beneficiaries. These minimal activities with Illinois fail to establish general jurisdiction. A corporate parent, especially one that is a holding company, may provide administrative services for its subsidiary without undermining corporate separateness and triggering personal jurisdiction over the parent. Administrating an Employee Retirement Income Security Act plan for a

subsidiary is not beyond the normal parent-subsidiary relationship.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employers*

[HN8]Whether or not a nonresident defendant is a plaintiffs' employer under the Fair Labor Standard Act is of no consequence to the question of jurisdiction. The fact that a defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > Distinct & Separate Principle*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employers*

[HN9]Dicta contained in a footnote of a United States Court of Appeals for the Tenth Circuit opinion, which suggests that a parent corporation can be an "employer" under Employee Retirement Income Security Act without fulfilling the Title VII of the Civil Rights Act of 1964 and Age Discrimination in Employment Act requirements for an employer, does not create a general rule that a parent corporation is an "employer" under the Fair Labor Standard Act (FLSA) simply because it administers a health plan for its subsidiaries. Moreover, such an argument is contrary to established law, that a parent corporation or corporate owner is considered an "employer" under the FLSA only where it exercises day-to-day control over the employees at issue. A parent corporation can be considered an "employer" under the FLSA based on its extensive managerial responsibilities over the employees at issue and its retention of substantial control over the terms and conditions of employment. A corporate shareholder can be considered an "employer" under the FLSA if the shareholder has operational control of the business's day-to-day activities,





2006 U.S. Dist. LEXIS 13777, *

the power to hire, fire and set salaries, and has the responsibility for maintaining employment records.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment***

[HN10]Courts typically use a sliding scale analysis to ascertain what level of internet interaction subjects a defendant to personal jurisdiction. The analysis consists of three levels: (1) where the defendant conducts business over the internet through its active website, (2) where the defendant maintains an interactive website, and (3) where the defendant maintains a passive website. The first category consists of situations where a defendant clearly does business over the internet. If the defendant enters into contracts with residents of a foreign jurisdiction over the internet, personal jurisdiction is proper. Websites in this category are "interactive" and allow for a transaction between the user and the website owner. The second category is occupied by interactive websites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of inter-activity and commercial nature of the exchange of information that occurs on the website. While websites in this category are not fully interactive, they do not permit as much interaction as those in the first category.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment***

[HN11]General jurisdiction has not been found on the basis of an interactive website in the absence of non-website factors that evidence an intent for a particular product or service to reach a particular state. No cases have been identified in which a court has found that a website can give rise to general personal jurisdiction; cases hold that the operation of a website can not do so. The United States District Court for the Northern District of Illinois, Eastern Division, has not found personal jurisdiction where a nonresident defendant's website had features that evidenced a minimal level of inter-activity, but there was no inter-activity with the action taken by the defendant as a result of individual communication, and the website provided no suggestion that the defendant was using the website to sell products directly over the website.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***

[HN12]The United States District Court for the Northern District of Illinois, Eastern Division, has granted a motion to dismiss for lack of jurisdiction after comparing a nonresident defendant's website, which provided dealer and sales information, including phone numbers, addresses, and e-mail addresses, to a national advertisement that would not usually create jurisdiction in Illinois.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Purposeful Availment***

[HN13]Where there is no activity by a nonresident defendant as a result of individual communication with its minimally interactive website, and the defendant is not using the website to sell products directly over the website, personal jurisdiction cannot be based on the defendant's website. There is no personal jurisdiction over a nonresident defendant whose website provides some inter-activity, including allowing users to electronically submit contract information and to receive information about the defendant's products and services. To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state.

**COUNSEL:** [*1]  For Victoria Abarca, Maria Sierra, on behalf of themselves and other similarly-situated persons, Plaintiffs: Jamie G. Sypulski, Law Offices of Jamie G. Sypulski, Chicago, IL; Douglas M. Werman, Werman Law Office, P.C., Chicago, IL.

For Manheim Services Corporation, doing business as Greater Chicago Auto Auction, Cox Enterprises, Inc., Defendants: Daniel Patrick Dawson, Nisen & Elliott, Chicago, IL; Gregory R. Fidlon, Marcia Bull Stadeker, Matthew D. Crawford, Dow, Lohnes & Albertson, PLLC, Atlanta, GA.

**JUDGES:** JOHN W. DARRAH, United States District Court Judge.

**OPINION BY:** JOHN W. DARRAH

  

2006 U.S. Dist. LEXIS 13777, *1

## OPINION

### MEMORANDUM OPINION AND ORDER

Plaintiffs, Victoria Abarca and Maria Sierra, filed suit against Defendants, Manheim Services Corporation d/b/a Greater Chicago Auto Auction ("Manheim/Greater Chicago") and Cox Enterprises, Inc. ("Cox"), for failure to pay Plaintiffs and other similarly situated employees earned overtime pay. Currently before the Court is Cox's Motion to Dismiss for Lack of Personal Jurisdiction.

### BACKGROUND

The following is based on the allegations in Plaintiffs' First Amended Complaint and affidavits submitted by Cox in support of its motion. Manheim, a wholly-owned subsidiary [*2] of Cox, owns and operates over 115 wholesale automobile auctions. Cox is incorporated in Delaware and has its principal place of business in Atlanta, Georgia. Cox has multiple subsidiaries, which in turn have several hundred subsidiaries. Manheim is a Delaware corporation with its corporate headquarters in Atlanta, Georgia. Manheim is licensed to do business in Illinois, using the trade name "Greater Chicago Auto Auction," and is a wholesale automobile auction located in Mattenson, Illinois. Cox is not licensed or authorized to do business in Illinois, and it does not do business in Illinois. Cox does not have a registered agent in Illinois, and it owns no property in Illinois. Cox does not hold meetings of its Board of Directors in Illinois.

The day-to-day operations of Manheim/Greater Chicago are managed by Greater Chicago employees, who make personnel decisions, including decisions about hiring and promoting employees. Cox does not negotiate contracts with Greater Chicago's customers, suppliers or contractors and does not pay Greater Chicago's expenses, including employees' wages and salaries. Cox sponsors and administers a health and welfare plan ("the Flex Plan") for the employees [*3] of Manheim and its other subsidiaries. Illinois employees of Manheim/Greater Chicago participate in the Flex Plan. Greater Chicago offers health and welfare benefits to its eligible employees via the Flex Plan. The costs of the benefits provided to Greater Chicago employees under the Flex Plan are shared between Greater Chicago and its participating employees. Cox also maintains a website, providing employment information for Cox and its subsidiaries, including Manheim, as more fully discussed below.

Plaintiffs reside in Chicago and were participants in the Flex Plan. Plaintiffs were employed as automobile "dealers" by Manheim/Greater Chicago whose duties included cleaning vehicles at the auto auction. Plaintiffs were directed to work in excess of forty hours per week and were entitled to compensation at a rate of one-and-one-half times their regular rate of pay for the excess hours. Plaintiffs allege that the Defendants (collectively, including Cox) unlawfully excluded from the regular rate calculation certain payments made to their employees, including: (a) bonus payments, (b) commission payments, and (c) periodic "flex credit payments." Failure to include these payments led to [*4] the failure to pay the employees overtime.

### ANALYSIS

[HN1]A plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction. *See Steel Warehouse of Wisc., Inc. v. Leach,* 154 F.3d 712, 714 (7th Cir. 1998). When determining whether the plaintiff has met the burden of establishing a *prima facie* case of jurisdiction, the court must take jurisdictional allegations in the complaint as true, unless controverted by the defendant. *See Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir. 1987) (*Turnock*). When deciding whether the plaintiff has made a necessary showing, a court can look to affidavits and exhibits submitted by each party. *See Turnock,* 816 F.2d at 333. Additionally, all factual disputes must be resolved in favor of the plaintiff. *Turnock,* 816 F.2d at 333.

[HN2]A determination of whether this Court has personal jurisdiction over the non-resident Defendants requires an examination of three sources of law: "(1) state statutory law, (2) state constitutional law, and (3) federal constitutional law." *RAR, Inc. v. Turner Diesel Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997) (*RAR* [*5] ).

[HN3]Under Illinois law, a defendant is subject to the jurisdiction of its courts if it is doing business within the state or if the cause of action arises from several specified acts, including committing a tortious act, within the state. 735 ILCS 5/2-209(b)(4), (a)(2). The statute also provides that an Illinois court may exercise jurisdiction on any basis permitted by the state or federal constitution. 735 ILCS 5/2-209(c). Therefore, the statute authorizes the exercise of personal jurisdiction by the Illinois courts

Page 5

  

2006 U.S. Dist. LEXIS 13777, *5

to the fullest constitutional limit; and the statutory analysis collapses into a due process inquiry, and whether the defendant engaged in any of the acts enumerated in the long-arm statute need not be considered by the court. *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Partnership,* 34 F.3d 410, 411 (7th Cir. 1994); *Euromarket Designs, Inc. v. Crate & Barrel Ltd.,* 96 F. Supp. 2d 824, 834 (N.D.Ill. 2000) (*Euromarket*); *LaSalle National Bank v. Vitro,* 85 F. Supp. 2d 857, 860 (N.D.Ill.2000) (*LaSalle*); *LFG, LLC, v. Zapata Corp.,* 78 F. Supp. 2d 731, 735 (N.D.Ill. 1999) [*6] (*LFG*).

[HN4]The Due Process Clause permits an Illinois court to exercise jurisdiction over a non-resident defendant only if the defendant has had "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945), *quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940); *Michael J. Neuman & Assocs. v. Florabelle Flowers,* 15 F.3d 721, 725 (7th Cir. 1994). A defendant need not be physically present within the jurisdiction to have sufficient minimum contacts if the defendant does something by which he purposefully availed himself the privilege of conducting activities in the forum state. *Hanson v. Denckla,* 357 U.S. 235, 252-54, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958). The critical inquiry is whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). This determination depends on whether the plaintiff asserts general or specific jurisdiction [*7] against the defendant. *RAR,* 107 F.3d at 1277.

[HN5]"General jurisdiction . . . is for suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has 'continuous and systematic general business contacts' with the forum state." *RAR,* 107 F.3d at 1277. A defendant with extensive contacts in a state can be subject generally to the personal jurisdiction of that state's courts. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984) (*Helicopteros*). In order to have general jurisdiction, the business activities of the defendant cannot be inadvertent,

trivial or sporadic; they must be intentional, substantial and continuous. *Asset Allocation & Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 570 (7th Cir. 1989). A finding that a non-resident defendant is doing business in Illinois so as to maintain a presence here subjects him to personal jurisdiction of Illinois courts for all matters. *Aetna Cas. & Sur. Co. v. Crowther, Inc.,* 221 Ill. App. 3d 275, 277, 581 N.E.2d 833, 163 Ill. Dec. 679 (1991).

[HN6]Specific jurisdiction "refers to jurisdiction over a defendant [*8] in a suit 'arising out of or related to the defendant's contacts with the forum.'" *RAR,* 107 F.3d at 1277, *quoting Helicopteros,* 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404. To determine whether specific jurisdiction exists, this Court must determine whether Cox has "purposefully established minimum contacts within [Illinois]" and whether those contacts would make personal jurisdiction reasonable and fair under the circumstances. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Defendants must have "purposefully availed" themselves of the privilege of conducting activities within the forum state, invoking the benefits and protections of its laws, such that they would "reasonably anticipate being haled into court there." *Asahi-Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987). The Plaintiffs must establish that haling Cox into court is consistent with the Fourteenth Amendment's due process clause. *LFG,* 78 F. Supp. 2d at 734. The due process requirement is met if: (1) the defendant has sufficient minimum contacts with the forum state; (2) the claims asserted arise or result from the defendant's forum-related activities; [*9] and (3) the exercise of jurisdiction is reasonable. *Euromarket,* 96 F. Supp.2d at 834.

Plaintiffs contend that Cox is subject to *impersonam* jurisdiction by maintaining the Flex Plan and as an employer. Although not pled in their Amended Complaint, Plaintiffs, in their response brief, claim *impersonam* jurisdiction over Cox based on Cox's maintenance of a website in Illinois.

*The Flex Plan and Cox as an Employer*

Cox's [HN7]activities in Illinois were not "substantial" or "continuous and systematic" by sponsoring a health and welfare plan that includes Illinois residents as participants and beneficiaries. These minimal activities with Illinois fail to establish general



2006 U.S. Dist. LEXIS 13777, *9

jurisdiction. *See Central State Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, No. 99 C 2524, 2000 WL 1015937, at *3 (N.D. Ill. Jan 31, 2000), *aff'd Central States. Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000) ("A corporate parent, especially one that is a holding company, may provide administrative services for its subsidiary without undermining corporate separateness and [*10] triggering personal jurisdiction over the parent."); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993) (*Frank*) (administrating a ERISA plan for a subsidiary is not beyond the normal parent-subsidiary relationship).

Plaintiffs also allege that Cox is their employer under the Fair Labor Standard Act. However, [HN8]whether or not Cox is the Plaintiffs' employer is of no consequence to the question of jurisdiction. "The fact that a defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised." *Central States. Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). Furthermore, Plaintiffs fail to support their argument that Cox is their employer. Plaintiffs rely upon [HN9]*dicta* contained in a footnote of *Frank*, 3 F.3d at 1365 n. 5, for the proposition that a parent corporation "can be an 'employer' under ERISA without fulfilling the Title VII and ADEA requirements of employer." However, this *dicta* did not create a general rule that a parent corporation is an "employer" [*11] under FLSA simply because it administers a health plan for its subsidiaries. Moreover, Plaintiffs' argument is contrary to established law that a parent corporation or corporate owner is considered an "employer" under FLSA only where it exercises day-to-day control over the employees at issue. *See E.E. Falk v. Brennan*, 414 U.S. 190, 195, 94 S. Ct. 427, 38 L. Ed. 2d 406(1973) (parent corporation could be considered "employer" under FLSA based on extensive managerial responsibilities over the employees at issue and parent corporation's retention of substantial control over the terms and conditions of the employees); *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1998) (corporate shareholder could be considered "employer" under FLSA if shareholder had operational control of the business's day-to-day activities, the power to hire, fire and set salaries, and had the responsibility for maintaining employment records). Contrary to the unrebutted facts in the affidavits submitted by Cox as set out above, none of these operational controls necessary to establish that a parent corporation is an "employer" under FLSA exist here.

Therefore, neither the Flex Plan maintained by Cox nor its [*12] purported status as employer is a basis for general jurisdiction.

*Cox Website*

Cox maintains a website that provides employment information about Cox and nearly all of Cox's subsidiaries, including Manheim. The Cox website allows prospective employees to access job information and allows a prospective employee to send information about himself to Cox, including posting a resume for consideration of a particular position. The website contains a "drop down" menu to view jobs available only in Illinois. Clearly, the Amended Complaint and affidavits establish the absence of specific jurisdiction. Plaintiffs' suit does not "arise out" of Cox's operation of its website.

Plaintiffs claim that the website gives rise to general personal jurisdiction. [HN10]Courts typically use a sliding scale analysis to ascertain what level of Internet interaction subjects a defendant to personal jurisdiction. *Euromarket*, 96 F. Supp.2d at 837; *Sch. Stuff, Inc. v. Sch. Stuff, Inc.*, 2001 U.S. Dist. LEXIS 23382, No. 00 C 5593, 2001 WL 558060 at *3 (N.D. Ill. May 21, 2001). The analysis consists of three levels: (1) where the defendant conducts business over the Internet through its active website, (2) [*13] where the defendant maintains an interactive website, and (3) where the defendant maintains a passive website. *Euromarket*, 96 F. Supp. 2d at 837-838.

The first category consists of "situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction . . . over the Internet, personal jurisdiction is proper." *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124(W.D.Pa. 1997)(*Zippo*). Websites in this category are "interactive" and allow for a transaction between the user and the website owner. *Euromarket*, 96 F. Supp.2d at 837.

The second category "is occupied by interactive websites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that





2006 U.S. Dist. LEXIS 13777, *13

occurs on the website." *Zippo, 952 F. Supp. at 1124*. While websites in this category are not fully interactive, they do not permit as much interaction as those in the first category. *Euromarket, 96 F. Supp.2d at 838*. [*14] [1]

> [1]   The final category consists of "situations where a defendant has simply posted information on an Internet website which is accessible to users in foreign jurisdictions. A passive website that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." *Zippo, 952 F. Supp. at 1124*.

Plaintiffs cite *Neomedia Tech. Inc. v. Airclic, Inc., 71 U.S.P.Q.2d (BNA) 1186, 2004 U.S. Dist. LEXIS 6634, No. 04 C 566, 2004 WL 848181 (N.D. Ill. April 16, 2004)* (*Neomedia*). However, as specifically noted in *Neomedia*,[HN11] general jurisdiction has not been found on the basis of an interactive website in the absence of non-website factors that evidenced an intent for a particular product or service to reach a particular state. *See Neomedia, 71 U.S.P.Q.2d (BNA) 1186, 2004 WL 848181 at * 3, quoting Infosys Inc. v. Billingnetwork.com Inc., 2003 U.S. Dist. LEXIS 14808, 2003 WL 22012687 (N. D. Ill. 2003); see also LaSalle, 85 F. Supp.2d at 862-63* (noting that neither party [*15] had identified any cases in which a court found that a website could give rise to general personal jurisdiction and citing cases holding that the operation of a website could not do so). For example, in *LaSalle*, personal jurisdiction was not found where a website had the following features: (1) an e-mail button to obtain financial information on the company, (2) an e-mail button for information on the company, (3) a customer service page that allowed individuals to directly interact with customer service representatives, (4) access to on-line catalogs of the company's products, and (5) a list of contact persons and contact information for further information on the company's products. *See LaSalle, 85 F. Supp. 2d at 862-63*. The court concluded that while "the above features do evidence a minimal level of 'interactivity,' there is no interactivity with the action taken by [the defendant] as a result of individual communication." *LaSalle, 85 F. Supp. 2d at 862*. The court also noted that the website provided "no suggestion that [the defendant] is using the website to sell products directly over the website." *LaSalle, 85 F. Supp. 2d at 862*.

[*16]

Likewise, in *Transcraft Corp. v. Doonan Trailer Corp., 45 U.S.P.Q.2D (BNA) 1097, No. 97 C 4943, 1997 WL 733905 (N.D. Ill. Nov. 17, 1997)*, the website in question provided dealer and sales information, including phone numbers, addresses, and e-mail addresses. [HN12]The court granted a motion to dismiss for lack of jurisdiction, comparing the website to a national advertisement that would not usually create jurisdiction in Illinois.

Cox's website falls within the second category; while not fully interactive, it does permit some minor interaction and offers only minimal interactivity. Prospective employees can search for positions in Illinois through a link and can upload their resumes. There is also a link to Cox's companies, including Manheim, which permits business to be conducted on-line. Here, like [HN13]*LaSalle*, there is no activity by Cox as a result of individual communication; and Cox is not using the website to sell products directly over the website. Accordingly, personal jurisdiction cannot be based on Cox's website. *See LaSalle, 85 F.Supp. 2d at 862; see also Neomedia, 71 U.S.P.Q.2D (BNA) 1186, 2004 WL 848181 at *4-6* (no personal jurisdiction over defendant that provided some interactivity, [*17] including allowing Illinois users to electronically submit contract information and later receive information about products and services); *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd. 64 F. Supp. 2d 448, 451 (E.D. Pa. 1999)* ("To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state.").

## CONCLUSION

For the foregoing reasons, Plaintiffs have not established a *prima facie* case for personal jurisdiction. Cox's Motion to Dismiss is granted.

Dated: March 24, 2006

JOHN W. DARRAH

United States District Court Judge

